ROBERT C. SCHUBERT (S.B.N. 62684)
WILLEM F. JONCKHEER (S.B.N. 178748)
NOAH M. SCHUBERT (S.B.N. 278696)
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone:      (415) 788-4220
Facsimile:      (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
nschubert@sjk.law

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

STEWART WILLIAMS, Individually and on Behalf of All Others Similarly Situated,

     Plaintiff,

v.

NETGEAR, Inc.

     Defendant.

No. 5:17-cv-2096

**CLASS ACTION COMPLAINT**

Jury Trial Demanded

1       Upon personal knowledge as to his own acts, and based upon his investigation, his

2   counsel's investigation, and information and belief as to all other matters, Plaintiff Stewart

3   Williams ("Plaintiff"), on behalf of himself and all others similarly situated, alleges:

4

5   **I.      INTRODUCTION**

6       1.      This is a class action brought on behalf of purchasers of the NETGEAR CM700

7   cable modem (the "Modem") sold by Defendant NETGEAR, Inc. ("Netgear"). A cable modem

8   is a device that allows cable subscribers to connect to broadband Internet service.

9       2.      As alleged herein, since its launch in 2016, Netgear marketed the Modem as a

10  reliable high-end modem that is "ideal for the fastest Internet speed service plans."

11      3.      However, Netgear failed to disclose that the Modem contains a serious defect that

12  prevents it from operating properly. News reports and customer complaints since the release of

13  the Modem indicate that it suffers from high spikes in network latency—delays in data

14  communication over the network—that degrades users' Internet connectivity.

15      4.      Plaintiff purchased a Modem for personal use and suffered network latency, an

16  experience shared by many purchasers of the Modem. Despite this widespread defect, Netgear

17  has not announced a recall of the affected model, or otherwise offered to repair or replace it.

18      5.      By shipping Modems with this defect, Netgear sold consumer goods that were

19  substantially below the quality generally available in the market, were not fit for the for the

20  Internet connectivity for which they were generally used, and were not adequately packaged and

21  labeled. Netgear, therefore, has breached its implied warranty of merchantability in violation of

22  the California Song-Beverly Consumer Warranty Act, CAL. CIV. CODE §§ 1790 *et seq.*  As a

23  result, all purchasers of the Modem that contained the defect are entitled to recover monetary

24  damages for the full purchase price of their cable modems.

25      6.      Netgear also concealed the network latency problem with the Modem through its

26  marketing, advertising, and packaging of the product. Netgear's misrepresentations and

27  omissions violate the California Consumer Legal Remedies Act ("CLRA"), CAL. CIV. CODE §§

28  1750 *et seq.*, and the California False Advertising Law ("FAL"), CAL. BUS. & PROF. CODE §§

---

17500 *et seq.* Netgear's conduct is also unlawful, fraudulent, and unfair in violation of the California Unfair Competition Law ("UCL"), CAL. BUS. & PROF. §§ 17200 *et seq.*

## II. PARTIES

7.      Plaintiff Stewart Williams is a citizen of Nevada. In 2017, Plaintiff purchased a Modem online through Amazon.com.

8.      Defendant NETGEAR, Inc. is a Delaware corporation with its principal place of business in San Jose, California. Netgear maintains extensive contacts within the State of California. Defendant maintains its principal headquarters in California, sells cable modems and other hardware, software, and services to California residents, and markets and advertises its products in California. Furthermoe, Netgear disseminated the misrepresentations at issue in this case from California, and its conduct at issue occurred in California. The defect also originated from a chipset that was designed by Intel Corporation, which is headquartered in California and designed the defective component at issue in California.

## III. JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because there are more than 100 proposed Class Members, some members of the proposed class and the Defendant are citizens of different states, and the amount in controversy exceeds $5 million.

10.      This Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts with California such that the exercise of jurisdiction by this Court over Defendant is consistent with notions of fair play and substantial justice. A substantial portion of the wrongdoing alleged in this Complaint took place in California; Defendant conducts business in California and otherwise avails itself of the protections and benefits of California law through the promotion, marketing, and sale of its Modems in the State; and this action arises out of or relates to these contacts.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendant maintains its principal office in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and a substantial part of the property that is the subject of the action is situated in this District.

12.     Intradistrict Assignment: Pursuant to Civil L.R. 3-2(c) and 3-5(b), assignment to the San Jose Division of the Northern District of California is proper, because a substantial part of the events or omissions which give rise to the claim occurred in this Division or a substantial part of the property subject to the action is situated in this Division. Defendant is headquartered in this Division and engaged in the extensive promotion, marketing, distribution, and sales of the products at issue in this Division.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     The Cable Modem Market.

13.     A cable modem is a device that enables a computer to transmit data over a coaxial cable line. The cable modem is located at the cable subscriber's home, and connects to the cable network to receive and transmit digital information between subscriber-owned devices (such as desktop PCs or routers) and the service provider's headend or central office, providing Internet connectivity for data and/or voice services.

14.     Cable subscribers generally obtain their cable modem for Internet connectivity in one of two ways—they either rent a cable modem that is owned by their cable service provider (for example, Comcast) or they purchase the cable modem at retail. Netgear is one of several manufacturers of cable modem hardware and related equipment for service providers and consumers. Other large competitors include Arris International plc and Cisco Systems, Inc.

15.     As of 2016, the cable subscriber base in the United States was approximately 50 million. Due to the size of the cable subscriber base, the market for cable modems is very large. According to Netgear's public statements, in the the markets in which it participates, "a seamless 'plug-and-play' or easy-to-install experience with little to no customer service and support is the

expected norm." Netgear has further stated that "[p]urchasing decisions in these markets are driven by the affordability and reliability of the products."

16.     Cable modem capability is measured by a telecommunications standard named Data Over Cable Service Interface Specification ("DOCSIS"). DOCSIS is administered by Cable Television Laboratories, Inc., known as CableLabs, a not-for-profit research and development consortium composed of industry participants. DOCSIS provides cable modem manufacturers and service providers a common method for products to work together in a predictable manner. DOCSIS has evolved over time to support new capabilities, including higher Internet speeds.The cable modems at issue in this case used the DOCSIS 3.0 standard.

17.     Cable modems may be differentiated based on the "bits per second" or "bps" they can process. A "bit" is a basic unit of information in computing and digital communications. The term "Gbps" is a measurement in billions of bits per second, "Mbps" is a measurement in millions of bits per second, and "Kbps" is a measurement in thousands of bits per second. Generally speaking, larger bps units denote higher data speed capability. Similarly, cable modems are equipped with "upload" and "download" channels for data. The more channels a cable modem has, the more bps the it can handle, improving capability.

**B. Netgear Markets the CM700 as a Cable Modem That Allows Users to "Stay Connected with Speed and Reliability without Stutter or Lag."**

18.     On its website, Netgear describes its Modem as follows:

> **Gigabit Speeds. Faster Downloads. Smoother Streams.**
>
> The NETGEAR CM700 High Speed Cable Modem provides a connection to high-speed cable Internet with speeds up to 1.4 Gbps‡. It is CableLabs® certified DOCSIS® 3.0 that is 32 times faster than 2.0 devices. The Gigabit Ethernet port provides faster access and downloads. CableLabs DOCSIS 3.0 certified to work with cable Internet providers like XFINITY® from Comcast, Spectrum, Cox and more

19.     During the Class Period, Netgear prominently marketed and advertised the Modem based on its purported speed and reliability. For example, on its website, Netgear explains the "Ideal Uses" of the Modem by including the following representations:

**Gigabit Speeds**

The CM700 cable modem supports speeds up to 1.4 Gbps‡ and can be used with your provider's fastest cable internet speed tiers. Whether you're simply surfing the web or streaming multiple HD videos simultaneously, you'll stay connected with speed and reliability.

**Faster Downloads. Smoother Streaming.**

Enjoy blazing fast transfer rates and uninterrupted 4K UHD video streaming with the CM700 DOCSIS® 3.0 cable modem. With support for 32 download and 8 upload channels, this modem optimizes your connection for smooth HD streaming and gaming. Whether you're simply surfing the web or streaming multiple HD videos simultaneously, *you'll stay connected with speed and reliability without stutter or lag.*

(third emphasis added)

20.     In addition, on its website, Netgear touted the Modem as providing "Up to 1.4 Gbps‡ download for streaming HD videos, faster downloads, and high-speed online gaming" and "32 downstream & 8 upstream channels providing efficient and reliable Internet access." Netgear also stated that the Modem used  a featured called "Channel Bonding" to allows consumers to "[g]et  fastest most reliable speeds with channel bonding."

1    21.    The packaging for the Modem repeated these claims and representations: (a)
2  Cable Internet speeds up to 1.4 Gbps‡—32 downstream & 8 upstream channels; (b) Ideal for the
3  fastest Internet speed service plans; and (c) CableLabs® DOCSIS® 3.0 Certified to work with
4  Cable Internet Providers like Charter*, Time Warner Cable® & more. A picture of the packaging
5  is included below:



**C. High Network Latency Results in Connection Delays and Prevents Cable Modems from Utilizing their Maximum Advertised Bandwidth.**

22.    In the context of computer networking, network latency refers to delays that occur in data communication over a network. Internet connections with low latency experience only small delay times, while Internet connections with high latency suffer from long delays.

23.     Although network speed is frequently only discussed in terms of bandwidth—the data rate supported by a network interface (e.g., 1.4 Gbps)—network latency matters equally to the end user's ability to make use of a device's advertised speeds. Excessive latency creates bottlenecks that prevent data from filling the network pipe, thus decreasing the effective throughput and limiting the maximum effective bandwidth of the connection.

24.     Network latency is measured in milliseconds ("ms"), where the number of milliseconds represents the amount of time each packet of data is delayed by. Smaller numbers indicate smaller delays, and larger numbers indicate substantial delays in the connection and a potential problem with the network device.

25.     For a cable modem, typical network latency between a computer and the cable modem ranges from approximately 5ms to 40ms. Latency above this range results in connection delays and prevents a cable modem from utilizing its maximum advertised bandwidth.

**D. Reports Surface that the Modem Suffers "Severe Latency Spikes."**

26.     In late 2016, reports surfaced regarding network latency experienced by Modem users. These reports attributed the problem to the Puma 6 Chipset made by Intel Corporation, which is a component of the Modem. According to an article by *The Register* dated December 3, 2016 entitled "Why Your Gigabit Broadband Lags Like Hell – Blame Intel's Chipset":

> Intel's Puma 6 chipset, used in gigabit broadband modems around the world, suffers from latency jitter so bad it ruins online gaming and other real-time connections.
>
> …
>
> The surges in lag are experienced by subscribers on various big ISPs, from Comcast, Charter and Cox in the US to Rogers in Canada and Virgin Media in the UK. You don't need a full 1Gbps connection to trigger the latency spikes – just at least a super-fast package and a buggy modem.
>
> Intel bought the Puma family of chips from Texas Instruments in 2010. The latest in the series – the DOCSIS 3.0-compatible Puma 6 – includes an Atom x86 processor, and it's aimed at gigabit broadband boxes. It claims it can handle internet traffic at speeds of up to 1.6Gbps.

The problem appears to be that the x86 CPU in the modem is taking on too much work while processing network packets. Every couple of seconds or so, a high-priority maintenance task runs and it winds up momentarily hogging the processor, causing latency to increase by at least 200ms and, over time, about six per cent of packets to be dropped. It affects IPv4 and IPv6 – and it spoils internet gaming and other online real-time interaction that need fast response times.

27.     Hundreds of users have complained in online forums about problems concerning cable modems containing the Puma 6 chipset, including the CM700. DSLReports has reported extensively on these issues, noting that "[t]here appear to have been more than a few complaints about [the Puma 6 chipset] floating around the internet across North America, most of them regarding the same severe latency and jitter issues xymox1 [a user on the DSLReports forums] has so carefully documented."

28.     Intel, in fact, has acknowledged the latency problem with cable modems that include its Puma 6 chipset, including the CM700. In a statement provided to *The Register*, an Intel spokesperson stated:

We are aware of an issue with the Puma 6 system-on-chip software that impacts latency and are working to address it.

29.     Similar network latency issues plague other modems containing the Puma 6 chipset. For example, the Arris SB6190, another Puma 6-based modem, suffers from severe network latency. According to an article on *DSLreports* dated December 1, 2016 entitled "Arris tells us it's working with Intel on SB6190, Puma 6 Problems":

Arris tells DSLreports the company is working closely with Intel on a problem in their SB6190 modem (more specifically the Intel Puma 6 Chipset) that causes owners to suffer significant jitter and latency on their connections. As we noted earlier this week the problem results in users seeing significant (250ms+) latency spikes and troubling DNS lookup delays when browsing the internet or gaming. The problem was examined in great detail in our forums by DSLreports regular xymox1.

Arris' statement makes it clear that Intel's Puma 6 chipset does appear to be the culprit in the jitter and latency problem.

> "ARRIS has been working actively with Intel to address the issue, which resulted in some SURFboard SB6190 users reporting latency while running high-performance apps," a company spokesperson tells me.

> "Intel is providing a firmware fix to correct the condition, and we will issue it as soon as it is available," the company added. "We remain committed to providing the best broadband experience for all users of ARRIS devices and regret any inconvenience this issue caused."

> Granted the Puma 6 chipset isn't just embedded in the Arris SB6190, but a wide variety of modems from an assortment of different vendors. Our forums are filled with complaints from users on various ISPs all with one thing in common: they're using a modem with the Intel Puma 6 chipset as its CPU. For example users in our Cox forum note the same problem is impacting users that bought the Netgear CM700 cable modem as well.

30.    The CM700 contains the same defective Puma 6 chipset that is causing network latency issues with the Arris SB6190. On November 6, 2016, in a discussion thread titled "CM 700 Chipset" that is posted on Netgear's official customer support forums at community.netgear.com, a user asks, "Just saw there is now a CM-700 modem 32X8 and wondered if it has the same chipset as the Arris SB6190 or is it Broadcom." In response, on November 9, 2016, user vkdelta, who is identified as a "NETGEAR Employee," writes:

> yes, same chipset. I guess I know where the question is coming .

> It is Intel based chipset. 32x8 Cable modem chips are made by one supplier only at this point. other guy gave up on it 2 years back and focussed on future.

31.    In another thread on Netgear's website concerning complaints about the CM700, posted on March 7, 2017, the same Netgear employee asks, "who is your ISP? if it comcast, They will have Puma6 CM700 fix deployed soon." Yet despite Netgear's acknowledgement of the ongoing defect with the Modem, no "fix" has been deployed that resolves the Modem's continuing network latency problems.

32.    Notwithstanding Netgear's awareness and acknowledgement of the Modem's network latency problems and customer complaints, Netgear continues to fail to disclose the defect in its marketing of the Modem and continues to refuse to repair or replace the Modems.

**E. Plaintiff Experiences Network Latency Caused by the Modem.**

33. Plaintiff purchased a Modem for personal use in 2017, which he used to connect his devices to the Internet. Plaintiff purchased the Modem through Amazon.com. Plaintiff's Modem was new and in its original packaging when he received it.

34. Plaintiff relied on the statements that Netgear made about the Modem, and based on those statements, believed that the Modem was a reliable cable modem that would perform as represented, including that it would "stay connected with speed and reliability without stutter or lag."

35. Plaintiff did not know that the Modem suffered from abnormally high network latency and unreliable Internet connectivity.

36. After purchasing the Modem, Plaintiff repeatedly suffered abnormally high network latency and unreliable Internet connectivity, including substantial packet loss and large lag spikes when playing video games. As a result of these issues, Plaintiff stopped using the Modem and replaced it with a cable modem that did not contain the Puma 6 chipset. Had Plaintiff known that the Modem was defective, he would not have purchased the Modem.

**V.     CLASS ACTION ALLEGATIONS**

37. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and a proposed Class defined as follows:

> **All persons in the United States who purchased a Netgear CM700 Cable Modem.**

38. Within the Class, there are two subclasses: (1) a Nationwide Consumer Subclass for purposes of Plaintiff's claims under the Song-Beverly Consumer Warranty Act and the Consumer Legal Remedies Act (the "Nationwide Consumer Subclass") and (2) a Nevada Subclass for purposes of a claim under Nevada's Deceptive Trade Practices Act on behalf of Nevada citizens (the "Nevada Subclass").

39. The proposed Nationwide Consumer Subclass is defined as follows:

**All persons in the United States who purchased a Netgear CM700 Cable Modem for personal, family, or household purposes.**

40. The proposed Nevada Subclass is defined as follows:

**All residents of the State of Nevada who purchased a Netgear CM700 Cable Modem.**

41. Excluded from the Class and Subclasses are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

42. This action is brought and may be properly maintained as a class action pursuant to Rule 23. This action satisfies the requirements of Rule 23, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

43. ***Numerosity.*** The Class and Subclasses are so numerous that the individual joinder of all members is impracticable. While the Class's and Subclasses' exact number are currently unknown and can only be ascertained through appropriate discovery, Plaintiff, on information and belief, alleges that the Class and Subclasses include at least thousands of persons.

44. ***Commonality.*** Common legal and factual questions exist that predominate over any questions affecting only individual Class or Subclass Members. These common questions, which do not vary among Class Members and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

    a.     Whether the Modem contains a defect that causes abnormally high network latency;

    b.     Whether the Modem is of the same quality as those generally acceptable in the market;

c. Whether the Modem is fit for the ordinary purposes for which the goods are used;

d. Whether the Modem was adequately contained, packaged, and labeled;

e. Whether Netgear breached its implied warranty of merchantability in violation of the Song-Beverly Consumer Warranty Act;

f. Whether Netgear represented that the Modem has characteristics, uses, or benefits that it does not have in violation of the CLRA;

g. Whether Netgear represented that the Modem is of a particular standard, quality, or grade when it is of another in violation of the CLRA;

h. Whether Netgear's representations and omissions regarding the Modem were false and misleading and constitute false advertising in violation of the FAL;

i. Whether Netgear engaged in unlawful, fraudulent, or unfair business practices in violation of the UCL,

j. Whether Netgear engaged in deceptive acts and practices in violation of the Nevada Deceptive Trade Practices Act;

k. Whether Plaintiff, the Class, and the Subclasses have been damaged by the wrongs alleged and are entitled to compensatory or punitive damages;

l. Whether Plaintiff and the Class are entitled to injunctive or other equitable relief, including restitution.

45. Each of these common questions is also susceptible to a common answer that is capable of classwide resolution and will resolve an issue central to the validity of the claims.

46. ***Adequacy of Representation.*** Plaintiff is an adequate Class and Subclass representative because he is a member of the Class and Subclasses, and his interests do not conflict with the Class's or Subclasses' interests. Plaintiff retained counsel who are competent and experienced in consumer-protection class actions. Plaintiff and his counsel intend to

prosecute this action vigorously for the Class's and Subclasses' benefit and will fairly and adequately protect their interests.

47. ***Predominance and Superiority.*** The Class and Subclasses can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Class or Subclass Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Class and Subclass Member's claim is impracticable. Even if each Class Member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.    CLAIMS FOR RELIEF

### First Claim for Relief
### Violation of California Song-Beverly Consumer Warranty Act,
### Cal. Civ. Code §§ 1790 et seq.

48. Plaintiff, individually and on behalf of the Nationwide Consumer Subclass, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

49. Plaintiff brings this claim individually and on behalf of the Nationwide Consumer Subclass against Defendant.

50. Plaintiff and the Nationwide Consumer Subclass purchased the CM700 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

51. Plaintiff and the Nationwide Consumer purchased the CM700 Modem new and in its original packaging and did not alter their Modems.

52. At the time of purchase, Defendant was in the business of manufacturing and selling cable modems, including the CM700 Modem.

53. The CM700 Modems were used and bought primarily for personal, family, or household purposes and are therefore consumer goods.

54. Netgear's CM700 Modem contained a defect that causes severe network latency. This defect was present in Netgear's CM700 Modems when they left the exclusive control of Defendant and therefore existed during the duration of the warranty period.

55. Netgear's CM700 Modems were not of the same quality as those generally acceptable in the trade; were not fit for the ordinary purposes of fast and reliable Internet connectivity for which the goods are used; were not adequately contained, packaged, and labeled; and did not conform to the promises and facts stated on the container and label.

56. Defendant, therefore, breached the implied warranty of merchantability, which by law is provided in every consumer agreement for the sale of goods, including for the sale of Netgear's CM700 Modem.

57. As a direct and proximate cause of Defendant's breach of the implied warranty of merchantability, Plaintiff and the Nationwide Consumer Subclass have been damaged by receiving an inferior product from that which they were promised. Plaintiff and the Nationwide Consumer Subclass, therefore, have the right to cancel and recover the purchase price of their CM700 Modem.

**Second Claim for Relief**

**Violation of California Consumer Legal Remedies Act,**

**Cal. Civ. Code §§ 1750 *et seq.***

58. Plaintiff, individually and on behalf of the Nationwide Consumer Subclass, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

59.     Plaintiff brings this claim individually and on behalf of the Nationwide Consumer Subclass against Defendant.

60.     Defendant is a "person" as defined in CAL. CIV. CODE § 1761(c).

61.     Plaintiff and the Nationwide Consumer Subclass acquired and purchased the CM700 Modem for personal, family, or household purposes and are therefore "consumers" as defined in CAL. CIV. CODE § 1761(d).

62.     The CM700 Modems that Plaintiff and the Nationwide Consumer Subclass purchased from Defendant are "goods" as defined by CAL. CIV. CODE § 1761(a).

63.     The purchases by Plaintiff and the Nationwide Consumer Subclass of the goods sold by Defendant constitute "transactions" as defined by CAL. CIV. CODE §§ 1761(e) and 1770.

64.     In connection with its sale of goods to Plaintiff and the Nationwide Consumer Subclass, Defendant violated the CLRA by:

    a.      Misrepresenting to Plaintiff and the Nationwide Consumer Subclass that the CM700 Modems were reliable cable modems, when in fact, they have a defect that causes severe network latency, in violation of CAL. CIV. CODE §§ 1770(a)(5), (7), (9), and (16);

    b.      Misrepresenting to Plaintiff and the Nationwide Consumer Subclass that Defendant's goods had characteristics, uses, and benefits that they did not have, in violation of CAL. CIV. CODE § 1770(a)(5);

    c.      Representing to Plaintiff and the Nationwide Consumer Subclass that Defendant's goods were of a particular standard, quality, or grade, when they were of another in violation of CAL. CIV. CODE § 1770(a)(7);

    d.      Advertising goods to Plaintiff and the Nationwide Consumer Subclass with the intent not to sell them as advertised, in violation of CAL. CIV. CODE § 1770(a)(9); and

    e.      Misrepresenting to Plaintiff and the Nationwide Consumer Subclass that the subject of a transaction has been supplied in accordance with a

previous representation when it had not, in violation of CAL. CIV. CODE §

1770(a)(16).

65.     In addition, under California law, a duty to disclose arises in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.

66.     Defendant had a duty to disclose to Plaintiff and the Nationwide Consumer Subclass that the CM700 Modem contains a defect that causes it to fail for the following three independent reasons: (a) Defendant had exclusive knowledge of the information at the time of sale; (b) Defendant actively concealed from Plaintiff and the Nationwide Consumer Subclass this defect, which causes substantial Internet connectivity failures and is important to customers; and (c) Defendant made partial representations to Plaintiff and the Nationwide Consumer Subclass regarding the speed and reliability of the Modem.

67.     Defendant violated the CLRA by supplying defective Modems and by further concealing this defect from Plaintiff and the Nationwide Consumer Subclass.

68.     Defendant's misrepresentations and omissions in violation of the CLRA were likely to mislead an ordinary consumer. Plaintiff and the Nationwide Consumer Subclass reasonably understood Defendant's representations and omissions to mean that the CM700 Modems were reliable for typical consumer use and did not contain a defect that would hamper their performance.

69.     Defendant's misrepresentations and omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

70.     Plaintiff and the Nationwide Consumer Subclass relied to their detriment on Defendant's misrepresentations and omissions in purchasing the Modems.

71.     Plaintiff, on behalf of himself and the Nationwide Consumer Subclass, demands judgment against Defendant under the CLRA for injunctive relief.

72.     Plaintiff, on behalf of himself and the Nationwide Consumer Subclass, further intends to seek compensatory and punitive damages. Pursuant to CAL. CIV. CODE § 1782(a), Plaintiff will serve Defendant with notice of its alleged violations of the CLRA by certified mail return receipt requested. If, within thirty days after the date of such notification, Defendant fails to provide appropriate relief for its violations of the CLRA, Plaintiff will amend this Complaint to seek monetary damages.

73.     Notwithstanding any other statements in this Complaint, Plaintiff does not seek monetary damages in conjunction with his CLRA claim—and will not do so—until this thirty-day period has passed.

**Third Claim for Relief**

**Violation of California False Advertising Law,**

**Cal. Bus. & Prof. Code §§ 17500 *et seq.***

74.     Plaintiff, individually and on behalf of the Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

75.     Plaintiff brings this claim individually and on behalf of the Class against Defendant.

76.     Defendant engaged in advertising and marketing to the public and offered for sale the CM700 Modem.

77.     Defendant engaged in the advertising and marketing alleged herein with the intent to induce the sale of the Modems to consumers like Plaintiff.

78.     Defendant's advertising and marketing representations regarding its CM700 Modems were false, misleading, and deceptive as set forth in detail above. Defendant also concealed the material information from consumers that these cable modems contained a defect that causes severe network latency and unreliable Internet connectivity.

79.     Defendant's misrepresentations and omissions alleged herein deceive or have the tendency to deceive the general public regarding the reliability of its CM700 Modems for ordinary consumer use.

80.     Defendant's misrepresentations and omissions alleged herein were the type of misrepresentations that are material, i.e., a reasonable person would attach importance to them and would be induced to act on the information in making purchase decisions.

81.     Defendant's misrepresentations and omissions alleged herein are objectively material to a reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

82.     At the time Defendant made the misrepresentations and omissions alleged herein, Defendant knew or should have known that they were untrue or misleading and acted in violation of CAL. BUS. & PROF. CODE §§ 17500 *et seq.*

83.     Unless restrained by this Court, Defendant will continue to engage in untrue and misleading advertising in violation of CAL. BUS. & PROF CODE §§ 17500 *et seq.*

84.     As a result, Plaintiff and each member of the Class has been injured, has lost money or property, and is entitled to relief. Plaintiff and the Class seek restitution, injunctive relief, and all other relief permitted under CAL. BUS. & PROF. CODE §§ 17500 *et seq.*

**Fourth Claim for Relief**

**Violation of California Unfair Competition Law,**

**Cal. Bus. & Prof. §§ 17200 *et seq.***

85.     Plaintiff, individually and on behalf of the Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

86.     Plaintiff brings this claim individually and on behalf of the Class against Defendant.

87.     Plaintiff has standing to pursue this claim because he has suffered injury in fact and has lost money or property as a result of Defendant's actions as described *supra*. All Class Members overpaid for the CM700 Modem due to Defendant's concealment of a defect with the CM700 Modem.

88.     Defendant's actions as alleged herein constitute an "unlawful" practice as encompassed by CAL. BUS. & PROF. CODE §§ 17200 *et seq.* because Defendant breached the

implied warranty of merchantability in violation of the California Song-Beverly Consumer Warranty Act, CAL. CIV. CODE §§ 1790 *et seq.* and further violated the CLRA, CAL. CIV. CODE §§ 1750 *et seq.* and the FAL, CAL. BUS. & PROF. CODE §§ 17500 *et seq.*

89.    Defendant's actions as alleged herein constitute a "fraudulent" practice because, by representing that the CM700 Modems were reliable for ordinary consumer use but concealing that the cable modems actually contained a defect, Defendant's conduct was likely to deceive consumers. Defendant's failure to disclose this defect, especially in light of its claims about speed and reliability, constitute a material omission in violation of the UCL.

90.    Defendant's actions as alleged in this Complaint constitute an "unfair" practice, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Netgear's customers. The harm caused by Netgear's wrongful conduct outweighs any utility of such conduct and has caused—and will continue to cause—substantial injury to Plaintiff and the Class. Netgear could and should have chosen one of many reasonably available alternatives, including not selling cable modems that contained a defect, disclosing the defect to prospective purchasers, and/or not representing that its cable modems were suitable for consumer use. Additionally, Defendant's conduct was "unfair," because it violated the legislatively declared policies reflected by California's strong consumer protection, consumer warranty, and false advertising laws, including the California Song-Beverly Consumer Warranty Act, CAL. CIV. CODE §§ 1790 *et seq.*, the CLRA, CAL. CIV. CODE §§ 1750 *et seq.*, and the FAL, CAL. BUS. & PROF. CODE §§ 17500 *et seq.*

91.    As a result of Defendant's unlawful, fraudulent, and unfair conduct, Plaintiff and the Class were damaged. Plaintiff and the Class received an inferior product from that which they were promised. Had Defendant disclosed the defect with the CM700 Modems, Plaintiff and the Class would not have purchased the cable modems or would have paid substantially less.

92.    Defendant's wrongful business practices constitute a continuing course of unfair competition because it continues to represent that the CM700 is reliable, continues to fail to disclose the defect, and continues to refuse to repair or replace the modems. Plaintiff and the

Class, therefore, seek equitable relief to remedy Netgear's deceptive marketing, advertising, and packaging and to recall all affected cable modems.

93. Plaintiff and the Class also seek an order requiring Defendant to make full restitution of all monies they have wrongfully obtained from Class Members, as well as all other relief permitted under CAL. BUS. & PROF. CODE §§ 17200 *et seq.*

**Fifth Claim for Relief**

**Violation of Nevada Deceptive Trade Practices Act,**

**Nev. Rev. Stat. §§ 598.0903, *et seq.***

94. Plaintiff, individually and on behalf of the Nevada Subclass, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

95. Plaintiff brings this claim individually and on behalf of the Nevada Subclass against Defendant.

96. The Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*, provides that the following types of conduct constitute deceptive trade practices:

      a.    knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith;

      b.    representing that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style, or model;

      c.    advertising goods or services with intent not to sell or lease them as advertised;

      d.    knowingly making any other false representation in a transaction;

      e.    offering to sell or lease goods or services which the seller or lessor in truth may not intend or desire to sell or lease, and refusing to show the goods

advertised or showing or demonstrating defective goods for sale or lease which are unusable or impractical for the purposes set forth in the advertisement.

97.     Defendant engaged in conduct constituting deceptive trade practices as defined above. Defendant knowingly and uniformly misrepresented the quality, capabilities, characteristics, and benefits of the Modems. Specifically, Defendants represented that its CM700 Modems were reliable cable modems, when in fact, Defendant knew that the CM700 Modems contained a defect that causes severe network latency and unreliable Internet connectivity.

98.     Despite being informed by its customers—and publicly by its supplier, Intel— that the Modems contained this defect, Defendant continued to sell these Modems with the knowledge that, contrary to its public representations, they were not reliable cable modems. Defendant made these representations knowing them to be false or consciously disregarding their accuracy or truth to induce Plaintiff and the Nevada Subclass members to purchase the Modems.

99.     Defendant omitted the important and material facts regarding the existence, nature, and extent of the netork latency defect in its CM700 Modems.

100.    Plaintiff and the Nevada Subclass members reasonably relied on the false representations and omissions of material facts and were induced to purchase the Modems to their detriment.

101.    Plaintiff and the Nevada Subclass members were injured and suffered actual loss as a direct and foreseeable result of Defendant's deceptive trade practices. Had Plaintiff and the Nevada Subclass Members known of the defect in the Modems, they would not have purchased the Modems or would have paid substantially less. Plaintiff and the Nevada Subclass further were unable to enjoy the expected use of their Modems that they bargained for and expected.

102.    Plaintiff and the Nevada Subclass members seek relief under Nev. Rev. Stat. Ann. § 41.600, including, but not limited to, injunctive relief, other equitable relief, actual damages, and attorneys' fees and costs.

# PRAYER FOR RELIEF

Plaintiff, on behalf of himself and the Class, requests that the Court order the following relief and enter judgment against Defendant as follows:

A.    An order certifying the proposed Class and Subclasses under Rule 23;

B.    An order appointing Plaintiff and his counsel to represent the Class and Subclasses;

C.    A declaration that Defendant has engaged in the illegal conduct alleged;

D.    An order that Defendant be permanently enjoined from its improper conduct;

E.    A judgment awarding Plaintiff and the Class restitution and disgorgement of all compensation obtained by Defendant from its wrongful conduct;

F.    A judgment awarding Plaintiff and the Class compensatory damages pursuant to its breach of implied warranty claim in an amount to be proven at trial;

G.    Prejudgment and postjudgment interest at the maximum allowable rate;

H.    Attorneys' fees and expenses and the costs of this action; and

I.    All other relief that the Court deems necessary, just, and proper.


# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.


Dated: April 14, 2017          By:    /s/ Noah M. Schubert
                                            ROBERT C. SCHUBERT (S.B.N. 62684)
                                            WILLEM F. JONCKHEER (S.B.N. 178748)
                                            NOAH M. SCHUBERT (S.B.N. 278696)
                                            SCHUBERT JONCKHEER & KOLBE LLP
                                            Three Embarcadero Center, Suite 1650
                                            San Francisco, CA 94111
                                            Telephone:    (415) 788-4220
                                            Facsimile:    (415) 788-0161
                                            rschubert@sjk.law
                                            wjonckheer@sjk.law
                                            nschubert@sjk.law

                                            *Counsel for Plaintiff*